GALE COSTA *vs.* FALL RIVER HOUSING AUTHORITY.

No. 06-P-1094.

Bristol. March 16, 2007. - February 27, 2008.

Present: LENK, GREEN, & SIKORA, JJ.

Further appellate review granted, 451 Mass. 1103 (2008).

*Housing Authority. Municipal Corporations,* Housing authority. *Administrative Law,* Hearing, Regulations. *Due Process of Law,* Administrative hearing.

In a civil action brought in the Housing Court under 42 U.S.C. § 1983, the Federal civil rights statute, arising from the termination by the defendant public housing authority (authority) of a tenant's Federal rent subsidy assistance payments following her arrest for soliciting sex for a fee and for keeping a house of ill fame at her federally subsidized apartment, the judge erred in restrictively interpreting the applicable Federal regulations to conclude that the authority lacked legal grounds to terminate the subsidy [275-278]; however, where the authority had accomplished the termination by relying on hearsay information in a police report and a newspaper article, by allowing the preliminary hearing officer who made the original termination decision to serve on the grievance panel reviewing the same decision, and by issuing a formal decision that lacked sufficient explanation to assure the application of a correct legal standard to trustworthy information, the process did not satisfy the plaintiff's right to fair procedure [278-282] and caused inaccurate fact finding and therefore genuine harm to the plaintiff, despite her subsequent plea of guilty to the charges [282-283]; therefore, this court remanded the matter to the Housing Court to limit the award of attorney's fees to work performed upon the plaintiff's successful § 1983 claim [284].

CIVIL ACTION commenced in the Southeast Division of the Housing Court Department on October 29, 2004.

The case was heard by *Anne Kenney Chaplin,* J., on motions for summary judgment.

*John Egan* for the defendant.

*Deborah G. Roher* for the plaintiff.

SIKORA, J. Police arrested Gale Costa and charged her with soliciting sex for a fee and keeping a house of ill fame at her federally subsidized apartment. Subsequently the Fall River Hous-

ing Authority (housing authority) terminated her subsidy pursuant to Federal housing regulations. Costa challenged the housing authority's decision by means of an action in the Southeastern Division of the Housing Court Department. Her complaint presented three claims: (1) that the housing authority had terminated her subsidy upon a ground unauthorized by the governing regulations of the Federal Department of Housing and Urban Development (HUD) so as to violate 42 U.S.C. § 1983 (2000)[1]; (2) that it had denied her procedural due process afforded by the pertinent HUD regulations and the Fourteenth Amendment to the United States Constitution, again in violation of 42 U.S.C. § 1983; and (3) that the termination decision constituted an error of law remediable by certiorari review as authorized by G. L. c. 249, § 4.

The Housing Court judge preliminarily enjoined the termination. Upon subsequent cross motions for summary judgment, a judge of that court concluded that the housing authority had acted without regulatory authority and without procedural due process. She entered a judgment and an order in favor of Costa effectively preserving her rental subsidy, awarding her damages of $1,950 for emotional distress compensable under § 1983, awarding her costs of $235, and awarding her attorney's fees of $11,000 recoverable under 42 U.S.C. § 1988 (2000).[2,3]

Upon review, we reverse the judge's ruling that the housing

---

[1] In pertinent part § 1983 provides, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

[2] The judgment entered on February 2, 2006. It denied the housing authority's motion for summary judgment as to counts 1 and 2, allowed Costa's motion for summary judgment as to counts 1 and 2, and dismissed as moot the certiorari claim contained in count 3. Costa has not appealed from the dismissal of the certiorari claim. On May 10, 2006, the judge entered an order disposing of the remaining issues. The parties stipulated to the figures of $1,950 for emotional damages, $235 for costs, and $11,000 for attorney's fees. In the circumstances of this case, we think that the judgment and the order, considered together, constitute a comprehensive, "separate judgment" required by Mass. R.Civ.P. 58(a), as amended, 371 Mass. 908 (1977). See *Lewis* v. *Emerson*, 391 Mass. 517, 520-521 (1984).

[3] The relevant provision reads, "In any action or proceeding to enforce . . .

authority lacked legal grounds to terminate the subsidy, but we affirm the ruling that it accomplished the termination without procedural due process. We remand the case for further action.

*Facts.* Costa rents a single-family house on a residential street in Fall River. She participates in the Federal Housing Choice Voucher Program popularly known as "section 8" assistance.[4] Under its terms, Costa qualified as a low-income recipient of rental assistance from a local public housing authority (PHA). Under the appropriate formula, the housing authority at the time of these events paid her private landlord $395 of the $463 monthly rent (85.3%).

The arrest of Costa occurred on the evening of June 24, 2004, on charges of engaging in sexual conduct for a fee under G. L. c. 272, § 53A, and of keeping a house of ill fame under G. L. c. 272, § 24. By letter of July 12, 2004, the housing authority notified her of its intent to terminate her assistance as of

---

[§ 1983] . . . , the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs . . . ." 42 U.S.C. § 1988(b).

[4]A compact description of the program appears in *Wojcik* v. *Lynn Hous. Authy.,* 66 Mass. App. Ct. 103, 103 n.2 (2006). The following passage sets our background.

> "The Housing Choice Voucher Program, commonly referred to as 'section 8,' was established by Congress pursuant to § 201(a) of the Housing and Community Development Act of 1974, amending § 8 of the United States Housing Act of 1937. See 42 U.S.C. § 1437f(o) (2003); 24 C.F.R. §§ 982.1 et seq. (2005). It allows low-income families seeking assistance to apply to a local public housing authority . . . . See 24 C.F.R. § 982.1. If approved, the local housing authority will issue a section 8 voucher to the family. See 24 C.F.R. § 982.302. With this voucher, the family may then locate a suitable apartment in the private market and enter into a lease that is in accordance with the applicable housing authority guidelines. *Ibid.* Once the housing authority has approved the lease, the family may then pay thirty percent of its adjusted monthly income to the owner of the unit in satisfaction of its rent obligation. 42 U.S.C. § 1437f(o)(2)(A). Under its own agreement with the owner, the housing authority then pays the owner the difference between what the tenant has paid and the monthly rent charged. 42 U.S.C. § 1437f(c)(3).

> "The section 8 housing voucher program is the most significant form of Federal housing assistance. . . . In 2003, there were about 2.1 million housing vouchers and only twenty-five percent of eligible households received assistance; many communities experience long waiting lists and have even stopped issuing new vouchers."

September 1, 2004, pursuant to 24 C.F.R. § 982.551 (2007), for violating a recipient's "family obligation" not to engage in "criminal activity that threatens the health, safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises."

The letter referred her to an enclosed copy of a police report of her arrest. The report gave the following account. On June 23, 2004, a detective using the name "Jay" made an appointment with Costa. The next day, armed with an anticipatory search warrant, Jay came to Costa's apartment at the scheduled time of 9:30 P.M. Costa and her friend Judy, both dressed in lingerie, greeted Jay and invited him to Costa's bedroom. She informed him that the price for a "dominatrix session" was seventy-five dollars, and for sex another twenty-five dollars. Sex with both women would cost $150, with Judy and Costa receiving seventy-five dollars each. Jay went outside to "get the money." At that point, other detectives entered the house and arrested Costa and Judy. After the arrest, Costa told Judy, "I had a feeling he was a cop . . . . [W]e should not have gotten into the sex thing. Charging money for . . . sex is what got us into trouble. DOM [charging for a dominatrix session] is not illegal." Among other items, the police recovered an appointment book with men's names and dates. The appointment book listed Jay's engagement for June 24, 2004, at 9:30 P.M.

Costa requested a "preliminary appeal hearing" with the housing authority to challenge the decision to terminate her subsidy. On July 22, 2004, housing authority hearing officer Theresa Quental conducted that session. She affirmed the housing authority's decision. Costa appealed to the housing authority's grievance panel. Two members of the housing authority, two members of the housing authority joint tenants council, and a fifth member chosen by the agreement of the other four members comprised the panel. Quental was a member of the panel. A housing authority employee read the police report into the record. The panel also received a newspaper article about Costa's arrest, which summarized the police report with some editorializing.

The article quoted a detective lieutenant serving as "[p]olice spokesman" to the effect that the police department's expert would try to extract more evidence from Costa's seized "com-

puter system" and that the police might confront Costa's identifiable customers for evidence as part of an ongoing investigation. A headline and subheading announced, respectively, "Police close house of prostitution taking orders online" and "Cops say operation combined latest technology, oldest profession." At the hearing before the grievance panel, Costa had representation by counsel. She testified that she was a dominatrix and that she used Internet chat rooms to meet people inclined to participate in fantasy play. She had agreed to meet Jay for a dominatrix session and had expected to receive a fee. When Jay pressured her to have sex, she had refused. A friend had been present at her home who was willing to have sex with Jay. Costa denied statements attributed to her in the police report that she had offered to have sex with Jay for a fee and that she had regretted involvement in prostitution. She offered letters from two nearby residents who vouched for her reputation as a good neighbor. She also offered letters from a therapist and a physician stating that she suffered from bipolar disorder and acted on impulses when she was in a manic state.

At the end of the hearing the panel voted unanimously to terminate Costa's subsidy. On August 31, 2004, the housing authority formally notified her of that decision in writing. It included the grounds for termination: "This determination is based on the following: the preponderance of evidence of criminal activity that includes — police report from the Fall River Police Department dated June 24, 2004 of your arrest and a newspaper article from the Fall River Herald News dated July 8, 2004."

Also on August 31, 2004, Costa pleaded guilty to both criminal charges against her, and received a term of probationary conditions through March 1, 2006.

*Discussion.* 1. *Standard of review.* In review of a grant of summary judgment, the appellate court examines the factual materials in the light most favorable to the losing party and determines the correctness of the law applied to them. See *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991). It works de novo from the same record as the motion judge. See *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 123 n.1 (1997). In this instance the material facts are undisputed. Our task is to resolve two issues of law, one of substance and

one of procedure: (1) whether the pertinent HUD regulations furnished grounds for termination of section 8 assistance; and (2) whether the housing authority undertook termination by a fair process required by HUD regulations and due process standards of the Fourteenth Amendment to the United States Constitution.[5] See, e.g., *Atlanticare Med. Center* v. *Commissioner of the Div. of Med. Assistance*, 439 Mass. 1, 6 (2003); *Commerce Ins. Co.* v. *Commissioner of Ins.*, 447 Mass. 478, 481 (2006) (questions of statutory construction [and by analogy the interpretation of administrative regulations] receive de novo review). See also *Anastos* v. *Sable*, 443 Mass. 146, 149 (2004) (unrestrained review will apply to legal conclusions).[6]

---

[5] A plaintiff may bring an action in a State trial court for alleged violation of the civil rights provision of 42 U.S.C. § 1983. See *Maine* v. *Thiboutot*, 448 U.S. 1, 10-11 (1980); *Rzeznik* v. *Chief of Police of Southampton*, 374 Mass. 475, 484-486 (1978); *Wojcik* v. *Lynn Hous. Authy.*, 66 Mass. App. Ct. at 105 n.4, 115-116.

In addition, Costa's Housing Court complaint properly invokes jurisdiction under G. L. c. 185C, § 3 (legal and equitable powers of the Housing Court in actions "concerned directly or indirectly with the health, safety, or welfare, of any occupant of any place used . . . as a place of human habitation and . . . use of any particular housing accommodations"). Since the housing authority, organized under G. L. c. 121B, § 3, acted under the color of State law and since the deprivation of the subsidy would affect Costa's "health, safety, or welfare," the Housing Court properly exercised subject matter jurisdiction over her Federal civil rights claims. See *Parsons* v. *Mobile Home Park Rent Control Bd. of Chicopee*, 423 Mass. 631, 636 (1996) (remanding the case to the Housing Court for the entry of judgment on the merits without questioning the Housing Court's jurisdiction over a § 1983 claim); *Wojcik* v. *Lynn Hous. Authy.*, 66 Mass. App. Ct. at 105 n.4, 115-116 (reviewing the judgment of the Housing Court in a § 1983 action resulting from a housing authority's termination of section 8 assistance).

[6] The housing authority argues that the only appropriate process for judicial review of its termination decision should be an action instituted in the Superior Court under the Administrative Procedure Act, G. L. c. 30A, § 14(1)-(7), limited to the restraining standards of § 14(7)(*a*) through (*g*). The argument fails because the housing authority is not an "agency" within the meaning of the statute. An agency is "any department, board, commission, division or authority of the state government or subdivision of any of the foregoing." G. L. c. 30A, § 1. A local housing authority, organized pursuant to G. L. c. 121B, § 3, "is a public body, analogous in various respects . . . to a municipal corporation." *Finance Commn. of Boston* v. *McGrath*, 343 Mass. 754, 814 (1962). "Nothing in [G. L. c. 121B, § 3,] indicates that [a housing authority] should be treated as a 'political subdivision' of the Commonwealth." *Simmons* v. *Clerk-Magistrate of the Boston Div. of the Hous. Ct. Dept.*, 448

2. *The authority to terminate assistance.* The power of the housing authority to terminate Costa's section 8 subsidy hinges on the integrated interpretation of three HUD regulations. The provisions governing program admittance, denial, participation, and termination appear in subpart L of part 982 (section 8 tenant based assistance: housing choice voucher program) of the Code of Federal Regulations at 24 C.F.R. §§ 982.551-982.555 (2007).

The first provision of our concern, § 982.551, sets out "the obligations of a participant family." Section 982.551(l) addresses the duty to refrain from criminal conduct (emphasis supplied):

> "Crime by household members. The members of the household may not engage in drug-related criminal activity or violent criminal activity or other criminal activity that threatens the health, safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises *(see § 982.553)*."

The second pertinent provision, § 982.552, addresses the sanction of "termination of assistance for [a] family." Section 982.552(c)(1)(i) reads as follows (emphasis supplied):

> "(1) Grounds for denial or termination of assistance. The PHA may at any time . . . terminate program assistance for a participant, for any of the following grounds:
>
> "(i) If the family violates any family obligations under the program (see § 982.551). *See § 982.553* concerning denial or termination of assistance for crime by family members."

Mass. 57, 62 (2006). See *Danusis* v. *Longo,* 48 Mass. App. Ct. 254, 260 (1999) ("[a] local board, such as a board of health, is generally not a 'state agency' within the scope of G. L. c. 30A, § 1[2]"); *Robinson* v. *Board of Health of Chatham,* 58 Mass. App. Ct. 394, 395 n.4 (2003) ("G. L. c. 30A[] does not apply to municipal and other local bodies").

In addition, review under G. L. c. 30A, § 14, presumes compliance with the adjudicatory procedural requirements of G. L. c. 30A, § 11 (reasonably specific notice; time for preparation; right to give evidence, cross-examine, and rebut; a full official record; and a written decision of detailed reasoning including the determination of necessary fact and law). As we shall see, c. 30A demands a more formal and rigorous proceeding than the hearing required for section 8 termination by the housing authority.

Finally, § 982.553 addresses the sanction of "termination of assistance for criminals and alcohol abusers," and includes the following text:

"(b) Terminating assistance —

"(1) Terminating assistance for drug criminals

". . .

"(2) Terminating assistance for other criminals. The PHA must establish standards that allow the PHA to terminate assistance under the program for a family if the PHA determines that any household member has violated the family's obligation under § 982.551 not to engage in violent criminal activity."

The Housing Court judge reasoned that the underscored cross-references to § 982.553 appearing within § 982.551(l) and § 982.552(c)(1)(i) acted as a limitation upon the meaning of violative criminal activity in those provisions. She concluded that the cross-references amounted to specific language superseding general terms, and that they narrowed the meaning of "other criminal activity that threatens the health, safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity" (§ 982.551) and criminal violation of family obligations (§ 982.552) to the category of "violent criminal activity" contemplated in § 982.553. Because the housing authority had terminated Costa's assistance under § 982.551 for "other criminal activity that threatens the health, safety or right to peaceful enjoyment of other[s]" of a *nonviolent* character, the judge concluded that it lacked the support of a ground authorized by the regulation.

For multiple reasons this interpretation of the regulations does not withstand analysis. We construe administrative rules under the same canons guiding statutory construction. See *Warcewicz* v. *Department of Envtl. Protection*, 410 Mass. 548, 550 (1991); *Figueroa* v. *Director of the Dept. of Labor & Workforce Dev.*, 54 Mass. App. Ct. 64, 70 (2002).

Those guideposts point strongly against such a restrictive interpretation of the grounds for termination. First, as the judge

observed, specific language in a statute or regulation will typically supersede general treatment of a subject if conflict or tension exists between the expressions. See *TBI, Inc.* v. *Board of Health of N. Andover*, 431 Mass. 9, 18 (2000). However, we do not find the cross-references to § 982.553 to be so specific as to shrink the language of § 982.551(l) and § 982.552(c)(1)(i) creating a sanctionable family obligation to refrain from "other criminal activity that threatens the health, safety or right to peaceful enjoyment of other residents" and neighbors. Both references use the general signal "see" without elaboration. The first one is a parenthetical in § 982.551(l). The second appears in § 982.552 in combination with a cross-reference to § 982.551 and the duty to avoid the more general threatening criminal activity. Section 982.553 deals exclusively with termination for criminal activity of a violent or drug- or alcohol-related nature. It is silent about "other criminal activity." Nothing in § 982.553 suggests that this silence voided the proscriptions about "other criminal activity" in §§ 982.551 and 982.552. An equally plausible interpretation is that the cross-references are simply sending the reader to adjacent provisions for a comprehensive understanding of the grounds for termination, and not that any one ground is curtailing another.

Other relevant canons converge in support of the ground of "other criminal activity that threatens the health, safety or right to peaceful enjoyment of other residents" and neighbors as a basis for termination independent of criminal activity of a violent or drug- or alcohol-related character. Every substantive word of a provision should count. None should be superfluous, meaningless, barren, or ineffectual. See, e.g., *Negron* v. *Gordon*, 373 Mass. 199, 201-202 (1977); *Baystate Med. Center* v. *Blue Cross of Mass., Inc.*, 382 Mass. 485, 491 (1981). Courts will view a regulatory scheme as a whole and whenever possible will interpret overlapping or concurrent treatment of a common subject by multiple provisions harmoniously so as to preserve some useful effect for each one. See, e.g., *Marshall House, Inc.* v. *Rent Control Bd. of Brookline*, 358 Mass. 686, 697-699 (1971); *Board of Educ.* v. *Assessors of Worcester*, 368 Mass. 511, 513-514 (1975). Courts will also avoid literal interpretations contradictory of the visible purpose of a provision. See, e.g., *Lexington* v. *Bedford*, 378 Mass. 562, 570 (1979); *Bates* v. *Director of the*

*Office of Campaign & Political Fin.*, 436 Mass. 144, 165-168 (2002).

The interpretation of the Housing Court creates an unnecessary conflict between the regulations. It effectively nullifies a discrete provision of substance: a category of criminal activity unrelated to violence, drugs, or alcohol but threatening to the health, safety, or quiet enjoyment of residents and neighbors and therefore warranting section 8 termination. It renders a clause of § 982.551(l) meaningless, fails to reconcile it with the ambiguous cross-references to § 981.553, and tends to contradict the perceptible purpose of the clause to make a distinct body of criminal behavior subject to termination. An interpretation compliant with the canons is that the regulations mesh compatibly to authorize termination for all three categories of criminal activity: violent behavior; conduct related to drug or alcohol abuse; and other conduct threatening to the health, safety, and quiet enjoyment of residents and neighbors.

A point of rule-making history supports this analysis. The 1995 and 2001 versions of § 982.551(l) are identical, including the parenthetical cross-reference to § 982.553, with one notable exception: an amendment in 2001 introduced the new family obligation to refrain from "other criminal activity that threatens the health, safety or right to peaceful enjoyment of other residents" and neighbors. See 66 Fed. Reg. 22,805 (2001). We infer that the retained parenthetical cross-reference to § 982.553 relates only to the preexistent categories of violent and drug-related criminal activity.[7,8]

3. *Due process claims.* The Housing Court judge held also that the housing authority had deprived Costa of fair procedure.

---

[7]Compare 24 C.F.R. § 982.551(l) (1995) and 24 C.F.R. § 982.551(l) (2001) with 24 C.F.R. § 982.553.

[8](a) As a result of her interpretation of the regulations, the judge expressly refrained from discussion of Costa's alternative argument that, if prostitution did constitute "other criminal activity" within the prohibition of § 982.551, the housing authority must still prove as a matter of specific fact that the activity threatened the health, safety, or peaceful enjoyment of other residents and neighbors. Costa points out that she lives on a dead-end street (of inferably lighter traffic volume), that two of her neighbors submitted letters supporting her reputation, and that her landlord did not terminate her tenancy as a result of her arrest.

The Housing Court did not decide the issue whether an incident or practice

The judge reasoned that the housing authority had not afforded her (1) the opportunity to confront and to test information submitted against her; (2) an impartial decision maker; and (3) a reliable decision, based upon information offered in the hearing and upon valid rules, and embodied in adequately written find-

of prostitution comprises a per se commission of prohibited "other criminal activity" or merely the occasion for specific proof of a threat to the health, safety, or right of peaceful enjoyment of residents and neighbors. Therefore we have not reviewed that question. Since both sides have argued it as matter of law and since it could recur in any further proceedings, we make the following observation as guidance and not as decision. See *Sanguinetti* v. *Nantucket Constr. Co.*, 5 Mass. App. Ct. 227, 228 (1977); *Bartula* v. *Bartula*, 6 Mass. App. Ct. 907, 907 (1978).

Massachusetts public housing laws treat an eviction for prostitution differently from a no-fault eviction. General Laws c. 121B, § 32, requires a local housing authority (implementing a local, not Federal housing assistance program) to provide a tenant with a hearing before commencing a summary process action, unless the cause for eviction is a criminal activity that is "associated with violence, or visibly asocial." *Lowell Hous. Authy.* v. *Melendez*, 449 Mass. 34, 39-40 (2007), quoting from *Boston Hous. Authy.* v. *Bryant*, 44 Mass. App. Ct. 776, 780 (1998). One such "visibly asocial" criminal activity is prostitution. *Id.* at 39 n.3, citing G. L. c. 121B, § 32. See G. L. c. 139, § 4 (a place is a nuisance if used for prostitution). "It is important that a public housing authority be able to deal with such activity decisively and swiftly to avoid the spread of physical or social decay." *Boston Hous. Authy.* v. *Bryant, supra* at 779 (credit card fraud lacked the element of visibility).

We note also that § 982.551 couches the "other" wrongdoing in anticipatory terms. It punishes a "threat" to "the health, safety, or right to peaceful enjoyment of" residents and nearby persons. It does not require proof of the accomplished fact of disruption of health, safety, or peaceful enjoyment. See *Lowell Hous. Authy.* v. *Melendez, supra* at 40 (a public housing authority has discretion to terminate a tenancy for criminal activity that constitutes a threat to public safety; it should not have to wait until the criminal act in fact causes harm to other residents).

(b) As a further alternative position, Costa contends that the housing authority's administrative plan does not comply with HUD regulations. HUD requires PHAs to "adopt a written administrative plan that establishes local policies for administration of the program." 24 C.F.R. § 982.54(a) (2007). The administrative plan must state "PHA policy on matters for which the PHA has discretion." *Ibid.*

The housing authority's administrative plan meets HUD requirements. Under the subheading "Enforcing Family Obligations," it states that the housing authority "will terminate assistance if any household [member] engages in . . . criminal activity which may threaten the health, safety, or right to peaceful enjoyment of the premises by other residents or persons residing in the immediate vicinity." The housing authority need not, and perhaps could not, provide an all-inclusive list of crimes in this category.

ings and reasoning. Our decisions now recognize the entitlement of an eligible recipient of section 8 assistance to be a subsistence interest protected both by procedural regulations and by due process standards of the Fourteenth Amendment spelled out in the decision of *Goldberg* v. *Kelly*, 397 U.S. 254, 266-271 (1970). See *Wojcik* v. *Lynn Hous. Authy.*, 66 Mass. App. Ct. 103, 109-110 (2006) (citing Federal decisions); *Carter* v. *Lynn Hous. Authy.*, 66 Mass. App. Ct. 117, 124, *S.C.*, 450 Mass. 626 (2008).[9]

As the judge in this case observed, the HUD regulations and the more general *Goldberg* due process safeguards provide the section 8 recipient with at least five procedural assurances: (1) timely and informative notice of the reasons for termination, 24 C.F.R. § 982.555(a)(1)(v), *Goldberg, supra* at 267-268; (2) the opportunity to present evidence, and to confront and cross-examine witnesses, 24 C.F.R. § 982.555(e)(5), *Goldberg, supra* at 269-270; (3) the right to representation by counsel (but not at public expense), 24 C.F.R. § 982.555(e)(3), *Goldberg, supra* at 270-271; (4) the right to an impartial decision maker, 24 C.F.R. § 982.555(e)(4), *Goldberg, supra* at 271; and (5) the right to a written decision setting out factual findings and reasoning, 24 C.F.R. § 982.555(e)(6), *Goldberg, supra* at 271.

In this instance no question has arisen whether Costa received adequate notice and representation by counsel. The undisputed chronology of her experience consists of these events during 2004: her arrest on June 24; notice of the housing authority's intent to terminate forwarded on or about July 12; her preliminary, informal conference with hearing officer Quental on July 22; the August 3 panel hearing by five members including Quental, resulting in a vote of termination; the subsequent written notice of the termination vote by the panel on August 31; her plea of guilty to the charges of prostitution and keeping a house of ill fame, also on August 31; and notice of the affirmance of the termination by the housing authority's board of commissioners on October 14 (ending her section 8 assistance as of November 1).

---

[9]The decision of the Housing Court in the present case (on February 2, 2006) preceded the release by this court of the two Lynn Housing Authority decisions (both on April 14, 2006). See *Wojcik* v. *Lynn Hous. Authy., supra*; *Carter* v. *Lynn Hous. Authy., supra*.

This agenda furnished her adequate notice (the letter of intent dated July 12 annexed the full police report) and the opportunity to retain counsel for the essential panel hearing of August 3 and for a subsequent written appeal to the board of commissioners. However, as the judge found and ruled, three major procedural defects remained.

(a) *The right to confront and cross-examine witnesses.* The housing authority's panel decision acknowledged its reliance on the police report generated by her arrest and on a newspaper article fourteen days later. HUD regulations guaranteed her the right to "question any witness," 24 C.F.R. § 982.555(e)(5), and *Goldberg* afforded her the right to confront and cross-examine adverse witnesses. *Goldberg, supra* at 269-270. The housing authority's use of the hearsay information in the report and the newspaper story denied those rights. In effect the police officer and the newspaper reporter testified in absentia and beyond the reach of cross-examination. If, as here, HUD regulations do not provide the participant with the right to subpoena witnesses, the participant's right to "question any witness" becomes meaningless against hearsay information. See *Edgecomb* v. *Housing Authy. of Vernon*, 824 F. Supp. 312, 315-316 (D. Conn. 1993) (reliance on a police report and newspaper articles without provision to the section 8 recipient of an opportunity of confrontation violated due process).

In particular, the housing authority's consideration of the newspaper article was misguided. The face of the article was blatantly untrustworthy by reason of its slanted headings and its quotation from a police "spokesman" about conjectural later evidence expected from the computer taken from Costa's house. Reliance on a press account for essential information will inevitably undermine judicial confidence in the integrity of an administrative decision.

(b) *The entitlement to an impartial decision maker.* Quental served as the preliminary hearing officer on July 22. She had authority to reverse the original termination decision or to maintain it. Her ruling in favor of the housing authority moved the case forward to the grievance panel, and maintained the intended termination. She served also as a member of the five-person grievance panel at the climactic hearing of August 3. HUD regulation 24 C.F.R. § 982.555(e)(4)(i) provides that a

termination hearing may be conducted by "any person or persons designated by the [public housing authority], *other than a person who made or approved the decision under review or a subordinate of this person*" (emphasis supplied). Quental was a person who had "approved the decision under review." She was therefore disqualified from participation in the grievance panel.

The housing authority argues that the panel of five (two persons from the authority, two from the authority's tenants council, and a fifth person selected by those four) voted unanimously so as to dilute or eliminate the force of any prejudgment from Quental. However, we cannot rely upon that speculation in circumstances (1) in which Quental had the stature of a housing authority "hearings officer" and prior familiarity with the case, attributes likely to induce deference from the other panel members; (2) in which the panel voted on the same day as the hearing; (3) in which Quental authored the abbreviated written decision; and (4) in which the panel cited only the hearsay information available before the hearing and none of the information submitted at the hearing — an indication of greater attention to the prior process than to the hearing process. In short, the panel proceeding does not satisfy the regulation or the due process demand for reliable impartiality.

(c) *The requirement of a written, reasoned decision.* The formal grievance panel decision consisted of less than a page and referred only to the police report and the newspaper article. It contained no reference to legal standards (HUD regulations, housing authority policy, or plan provisions) or to the information submitted by Costa. An elaborate adjudicatory decision is not mandatory. However, the requirement of a written decision of findings and reasoning should contain sufficient explanation to assure the application of a correct legal standard to trustworthy information. The regulations and due process call for more than a bare conclusion. See *Edgecomb* v. *Housing Authy. of Vernon, supra* at 316. The decision fell short.

For these reasons the termination process did not satisfy Costa's right to fair procedure.

4. *The effect of the guilty plea.* The question remains whether these procedural flaws caused inaccurate factfinding and therefore any genuine harm to Costa, since she pleaded guilty to the

charges against her on August 31, 2004. The housing authority contends that the plea established an admitted violation of the "other criminal activity" prohibited by 24 C.F.R. § 982.551(l) so as to permit termination as of November 1, 2004, and to render moot any further litigation.

The controlling doctrine is more complex. A finding of guilt by trial is conclusive of the same factual issues in any later civil litigation. In contrast, a plea of guilty without trial has only evidentiary effect upon the same issues in any subsequent civil litigation. *Aetna Cas. & Sur. Co.* v. *Niziolek*, 395 Mass. 737, 747-750 (1985). The reason is that a trial accomplishes the deeper certainty of actual litigation of the facts, while a plea may result from extrinsic considerations by the prosecution (preservation of resources, elimination of the risk of an acquittal) and by the accused (elimination of the risk of a more serious conviction and greater punishment). *Ibid.* This distinction prevails in the Federal courts[10] and in the great majority of States,[11] even though the judge accepting the plea conducts a thorough colloquy to assure the intelligence, voluntariness, and factual basis of the plea.[12]

Therefore, at any subsequent termination proceeding, the housing authority will be able to introduce the guilty plea as evidence of criminal activity and Costa will be able to submit an explanation for the plea. See *Wojcik* v. *Lynn Hous. Authy.*, *supra* at 112 (affirming the opportunity of the section 8 recipient to offer evidence or information of "all relevant circumstances" concerning the cause of termination).[13]

---

[10]See *Haring* v. *Prosise*, 462 U.S. 306, 316 (1983).

[11]The Supreme Judicial Court has noted "that courts in at least thirty-nine other States join us in taking the position that a plea of guilty is admissible in evidence as an admission in subsequent civil litigation, but is not conclusive." See *Aetna Cas. & Sur. Co.* v. *Niziolek*, *supra* at 747 n.6, where the cases are collected.

[12]See *Aetna Cas. & Sur. Co.* v. *Niziolek*, *supra* at 749 ("It is true . . . that . . . judges in this Commonwealth must take great pains to ensure that the plea has a basis in fact. . . . While the judge taking the plea must satisfy himself that there is a factual basis for a charge, he need not find that the defendant actually committed the crime to which he is pleading guilty"). This view appears to govern even though the plea judge will typically ask the accused whether he is pleading guilty because he is, in fact, guilty and for no other reason. See Smith, Criminal Practice & Procedure § 23.55 (3d ed. 2007) (itemization of the model colloquy).

[13]As an additional argument against harmlessness and mootness by reason

5. *The award of attorney's fees.* The Housing Court judge awarded Costa fees of $11,000 pursuant to 42 U.S.C. §§ 1983 and 1988. That amount resulted from her determination of two violations of Federal law entitlements of Costa: supposed misapplication of the regulatory grounds for termination contained in 24 C.F.R. §§ 982.551, 982.552, and 982.553; and the denial of regulatory and constitutional entitlements to fair process. Since the first of these grounds was invalid, Costa is not a "prevailing party" within the meaning of § 1988 upon her claim of an unauthorized basis for her termination. She is not entitled to compensatory fees for attorney's work invested in that contention. Upon remand, the judge must make a corrective apportionment between the successful and unsuccessful § 1983 claims.[14] "Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee." *Hensley* v. *Eckerhart*, 461 U.S. 424, 440 (1983).

*Conclusion.* We reverse the determination that the housing authority lacked regulatory authority to pursue termination for reason of criminal activity. We affirm the determination that the housing authority did not provide a fair termination procedure. Upon remand, the Housing Court judge must limit the award of attorney's fees to work upon the plaintiff's successful § 1983 claim. In any subsequent termination proceeding in the housing authority, Costa's plea of guilty shall be admissible as evidence against her.

*So ordered.*

of the guilty plea, Costa points out that the denial of procedural due process may constitute a per se wrong "actionable [under § 1983] for nominal damages without proof of actual injury" beyond the procedural deprivation itself. See *Carey* v. *Piphus*, 435 U.S. 247, 266 (1978). See also *Edgecomb* v. *Housing Authy. of Vernon*, 824 F. Supp. at 317. We have therefore left in place the judgment of liability for procedural unfairness, the award of damages for resulting emotional distress, and the entitlement to a fee award reduced to fit the work upon the successful procedural claim.

[14]The award of § 1983 compensatory damages for emotional distress in the amount of $1,950 shall remain intact. Its small size and its probable source in Costa's experience of the process of termination (the prevailing claim) make any apportionment unnecessary.