Whitehead, Howard J., J.
INTRODUCTION
Pursuant to G.L.c. 30A, §14, the plaintiffs seek judicial review of a decision of the City of Salem Board of Health to grant to Salem and Northside Carting, Inc. their Application for a Minor Modification to a Site Assignment for the Salem Transfer Station. Currently before the Court is the plaintiffs’ Motion for Judgment on the Pleadings. After reviewing the parties’ submissions and the relevant law, the Court allows the plaintiffs’ Motion for Judgment on the Pleadings and vacates the decision of the Board.
BACKGROUND
The Salem Transfer Station is a 9.2-acre parcel of land located at 12 Swampscott Road, in Salem. Administrative Record (“A.R.”) Tab 11. On June 6, 1960, the Board assigned the site of the station for use as a solid waste incinerator. A.R. Tab 3. In 1975, the Department of Environmental Quality Engineering Division of Environmental Health granted Salem’s request to convert the use of the property to that of a refuse transfer station. A.R. Tab 1. The DEQE’s approval limited the operation of the transfer station “to the handling of 100 tons per day of refuse." Id. On June *301 3, 1994, the Department of Environmental Protection granted Salem a Permit by Rule to continue to operate the transfer station. A.R. Tab 3.
In 2007, Salem issued a Request for Proposals to redevelop the Property. A.R. Transcript Day 1 at 43.[3] Salem selected Northside’s proposal. On June 23, 2009, Salem and Northside submitted the Application to the Board. A.R. Tab ll.[4] The Application’s introduction states, “(t]he proposed project consists of increasing the capacity of the current 100-ton-per-day transfer station. In accordance with the Solid Waste Regulations in 310 CMR 16.22, any increase in the daily or annual tonnage limits of a solid waste facility is considered a ‘Minor Modification.’ ’’ Id. at 1. According to the Application, the existing building will be demolished and the existing on-site landfill will be closed. Id. at 1-2. The existing building comprises 5,500 square feet. Id., Figure 1 at 2. The tipping floor of the proposed new building will comprise approximately 7,500 square feet; however “the building will be expanded by approximately 2,200 [additional] square feet to obtain additional space within the building for processing and loading operations.” A.R. Tab 11 at 2. ‘The actual square footage of the building is expected to be approximately 9,700 square feet.” Id. The Application also indicated that all existing driveways would be repaved and that additional driveways would be added. Id.
The Application included a Traffic Impact and Access Study (“Traffic Study”) that was conducted by Vanasse & Associates, Inc. (“Vanasse”). A.R. Tab 6. The Traffic Study concluded that expanding the amount of waste processed at the transfer station from 100 tons per day to 400 tons per day would “result in an additional 54 vehicle trips (27 entering and 27 exiting) on an average weekday!.]” Id. at 15. The Traffic Study, however, was based on the premise that the transfer station was processing 100 tons of waste per day when the traffic count was conducted in November 2007. Id., Table 4, Transcript Day 1 at 66:12-14, 75:3-7.[5] In fact, when Vanasse conducted the traffic count, the transfer station received only 58 tons of waste. A.R. Transcript Day 2 at 15:3-6.
Vanasse subsequently corrected the traffic projections by assuming that when it conducted the traffic counts, the transfer station received 50 tons of waste per day and that in the future, it would receive 500 tons of waste. A.R. Transcript Day 2 at 15:16-16:6; Tab 22 at 1. On November 9, 2009, Vanasse submitted a supplemental Traffic Study, which increased the number of additional vehicle trips to 84. A.R. Tab 15 at 2. On November 18, 2009, Vanasse submitted a second supplemental Traffic Study, which concluded that expansion of the transfer station would result in 90 vehicle trips beyond the number that existed in November 2007, for a total of 230 daily vehicle trips. A.R. Tab 22 at 1. Although a larger number of trucks might have been expected using principles of simple math, that is not the case here because the “trucks that are coming in there [to the transfer station] are the packer trucks, and they can accommodate much more tonnage per vehicle going into the facility.” A.R. Transcript Day 2 at 16:18-20.
Northside and Salem also submitted an Air Quality Modeling Report (“Air Report”) prepared by Epsilon Associates, Inc. (“Epsilon”). The Air Report concluded, “the existing and proposed truck trips affiliated with Northside Carting are below the NAAQS [National Ambient Air Quality Standards] for fine particulate matter . . . and also below the EPA RfC [Reference concentration] for DPM [diesel particulate matter].” A.R. Tab 11, Figure 2 at 1-1. On November 18, 2009, Epsilon submitted an Updated Air Quality Report (“Updated Air Report”), based upon the recently increased number of truck trips per day to 230. The increase in vehicular traffic had a “very small” impact on emissions. A.R. Tab 24 at 1. The Updated Air Report also considered emissions from building operations. Id. Based on the assumption that the transfer station utilized water mist stations, fast closing doors, and negative pressure, 90% of the emissions would be released through the transfer station’s emissions stack. Id. The Updated Air Report concluded that the maximum impact from building emissions “[is] well within the National Ambient Air Quality Standards.” Id. at 2.
A Noise Impact Assessment Study (“Noise Study”) was also submitted with the Application. A.R. Tab 11, Figure 4. The Noise Study concluded that the “sound level impact assessment for the proposed expansion at the Salem Transfer Station indicates that predicted noise levels will comply with the most stringent daytime noise regulations.” Id., Figure 4 at 7-1. The report, however noted that truck “back-up alarms may temporarily result in ‘pure-tone’ conditions at locations to the north and west.” Id., Figure 4 at 7-1.[6]
On October 20, 2009, the Board published notice that on November 10,2009, it would commence public hearings on the defendants’ Application. A.R. Tab 12. Doctor Kenneth Whittaker, Esq. was appointed as the hearing officer for the hearing. At the start of the November 10th hearing, Dr. Whittaker provided an overview of how the hearing would proceed. A.R. Transcript Day 1 at 10-15. The hearing officer informed those in attendance that after Northside and Salem presented a summary of their proposal, the Board would have the opportunity to ask questions. A.R. Transcript Day 1 at 12. The public would then be permitted to question representatives from both Northside and Salem and make comments. A.R. Transcript Day 1 at 12. In order to maintain order during the public comment portion of the hearing, the hearing officer told members of the public to place their names on a sign-up sheet. A.R. Transcript Day 1 at 12. The hearing officer also informed the public that they could *302 submit written comments to the Board. A.R. Transcript Day 1 at 14.
Beth Rennard, City Solicitor, testified on behalf of Salem. Testifying on behalf of Northside were Alan Hanscom, of Beta Group, Inc., regarding the construction and design of the transfer station; Jefferey Dirk, of Vanasse, concerning the project’s effect on traffic; Dale Raczynski, from Epsilon, regarding the project’s impact on noise and air quality; and William Thomson, a principal of Northside. Approximately nineteen citizens made statements or asked questions during the public comment/question portion of the hearing. A.R. Transcript Day 1 at 110-85. The Board continued the hearing until November 24, 2009.
During the second night of the public hearing, Northside’s witnesses supplemented some of the information that they had presented during the first public hearing. Approximately thirty-five individuals signed up to ask a question or make a comment. A.R. Transcript Day 2 at 31 -32. Given the number of people who signed up, the hearing officer suggested that everyone who wanted to make a comment limit his or her remarks to “2 minutes or less, and that way we’ll get through that in approximately 30 to 45 minutes, just to leave a good amount of time for questions, which will probably take a little bit longer.” A.R. Transcript Day 2 at 32:4-8. As the various members of the public spoke the hearing officer had to inform four individuals that they had exceeded their two-minute time allotment; however, each individual was allowed to conclude his or her remarks. A.R. Transcript Day 2 at 44:19-45:4; 46:18-47:12; 49:15-50:8; 57:24-61:21. Paulette Puelo spoke for approximately five minutes, and was allowed to continue speaking after the hearing officer informed her three times that she had exceeded her allotted time. A.R. Transcript Day 2 at 57:24-61:21. Before the hearing concluded, the hearing officer reminded the public that they could submit written comments after the meeting concluded. A.R. Transcript Day 2 at 131-32.
On December 8, 2009 and December 15, 2009, the Board deliberated on the defendants’ Application. A.R. Transcript Day 3 and 4. By a vote of four to two, the Board approved the application. On February 9, 2010 and February 11, 2010, the Board signed the Conditions of Approval for the modification of the site assignment. A.R. Tab 39. The Conditions of Approval increased the daily average permitted waste processed at the transfer station to 400 tons per day, with a maximum of 500 tons per day. Id. The Conditions of Approval placed forty-three restrictions on the operation and maintenance of the transfer station. Id. The conditions most relevant to this proceeding include: (1) limiting the number of vehicles entering the transfer station to 115, which equates to 230 vehicle roundtrips; (2) requiring “routine litter control/policing and street sweeping along Swampscott Road from the intersection of Highland Ave to First Street” at least semi-monthly; (3) requiring the facility to have high speed transfer doors that are to remain closed except when vehicles are entering or exiting the facility; (4) prohibiting waste from being “handled or stored outside the enclosed receiving Facility”; (5) prohibiting vehicles from queuing on city streets; (6) requiring on-site vehicles and transfer trucks owned or controlled by the facility operator to be retrofitted with after-market emission control kits; (7) requiring vehicles to use ultra low sulfur diesel fuel; (8) requiring Northside to contract with a professional pest control management firm before the commencement of operations and on a semi-monthly basis; (9) requiring the use of odor neutralizing agents “in the misting system to effectively neutralize any odors exiting the building”; and (10) requiring traffic alterations. Id. at pars. 3, 7, 11, 14-19, 25, 28, 38, 40. On February 16, 2010, the Board published a Notice of the Conditions of Approval in the Salem News. Plaintiffs subsequently commenced this action.
The seventeen plaintiffs live in the area surrounding the transfer station property. Hutchinson Realty Trust owns property located at 331-333 Highland Avenue, Salem, which directly abuts the transfer station property and is located less than 500 feet from the transfer station itself. Multiple health care practices are located within the building at 331-333 Highland Avenue. Young World Academy operates a daycare and pre-school program at 3 Green Ledge Street, Salem, which is located less than 500 feet from the transfer station properly. Green Dolphin Village Condominium Trust owns a condominium complex located near the Property. The closest residential building within the Green Dolphin complex is located 242 feet from the transfer station property, and the transfer station itself is approximately 600 feet from the complex. Bruce Glinsky and Alan Samiljan both reside in townhouses located within the complex.
DISCUSSION
I. Standing
As an initial matter the defendants renew their contention that the plaintiffs lack standing to pursue this appeal because the plaintiffs’ alleged injuries are speculative and common to the entire community. For the reasons discussed in Justice Lowy’s Memorandum of Decision and Order on Northside Carting, Inc.’s Motion to Dismiss, this Court concludes that the plaintiffs have standing. Justice Lowy previously decided that Hutchinson Really Trust, Young World Academy, Inc., Green Dolphin Village Condominium Trust, and Anarpet Realty, Inc. had standing because of the proximity of their properties to the transfer station. It is apparent as well, based on the administrative record, that numerous other named plaintiffs live in close proximity to the transfer station and, therefore, will be uniquely affected by the increase in traffic and noise, and a possible reduction in air quality. See Cohen v. Zoning Bd. of Appeals of Plym *303 outh, 35 Mass.App.Ct. 619, 620-21 (1993) (where there Is a multi-party appeal of a zoning board’s decision it is only necessary to determine whether any one plaintiff is aggrieved in order to decide standing issue).
II. Review of the Board’s Decision
The plaintiffs contend that the Board’s decision was arbitrary, capricious, in excess of its authority, not in accordance with the law, and/or contrary to the requirements of G.L.c. 111, §§150A and 150A1/2, and the Department’s site assignment regulations, 310 Code Mass. Regs. §§16.00. Specifically, the plaintiffs allege that the Board (1) improperly treated the defendants’ Application as an application for a minor modification of a site assignment; (2) violated numerous provisions of the public hearings rules, 310 Code Mass. Regs. §16.20; (3) violated the site suitability criteria, 310 Code Mass. Regs. §16.40; and (4) violated numerous provisions of the standards and criteria for siting of facilities, G.L.c. Ill, §150Al/2. The Court will address each claim in turn.
A. Standard of Review
A reviewing court may modify or set aside an administrative agency’s decision if that decision exceeded the agency’s authority, was based upon an error of law, was unsupported by substantial evidence, or was arbitrary and capricious or otherwise not in accordance with the law. G.L.c. 30A, §14(7). Judicial review of an agency’s decision is confined to the administrative record. G.L.c. 30A, §14(5). A reviewing court is required to give due weight to the agency’s experience, technical competence, specialized knowledge, and the discretionary authority conferred upon it by statute. Hingham v. Department of Telecomm. & Energy, 433 Mass. 198, 201 (2001). A reviewing court may not substitute its judgment for that of the agency. Flemings v. Contributory Ret. Appeal Bd., 431 Mass. 374, 375 (2000).
B. Analysis a. Application for Site Modification
The Plaintiffs argue that the defendants’ Application was incorrectly classified and reviewed as an application for a minor modification. They contend that the defendants’ Application should have been treated as an application for a major modification. The defendants, however, assert that the Application was correctly treated as an application for a minor modification because the Application sought to increase the daily permitted tonnage of solid waste processed at the facility to an average of400 tons per day, and that the regulations deem simple increases in allowable tonnage as minor modifications.
A brief summary of the statutory and regulatory framework governing the siting and permitting of waste transfer stations is necessary at this point. General Laws c. 111, §§ 150A and 150A1/2 outline the process for obtaining a site assignment for a waste transfer station. A site assignment is required for a new facility or “the expansion of an existing facility.” G.L.c. 111, §150A. “However, §150A does not define the terms ‘new facility or expansion of an existing facility,’ ” a task “the Legislature delegated to the department.” Goldberg v. Board of Health of Granby, 444 Mass. 627, 629 (2005). Pursuant to this authority, the Department defined “Expand a Site” to mean “to move a solid waste facility’s operation to ¿ previously unassigned site that is contiguous to the original site or to modify a solid waste facility’s operations causing it to exceed any capacity or total volume limit stated in its current site assignment."[7] 310 Code Mass. Regs. §16.02 (emphasis added).
The Department’s regulations differentiate between major modifications and minor modifications of a site assignment. A Major modification of a site assignment includes “modification required to ‘Expand a Site’; vertical expansions beyond the limits of an approved plan; modifications as specified at 310 CMR 16.21(1) and 16.21(3); Alternative Use of an Assigned Site; or any request to waive any site assignment criterion set forth at 310 CMR 16.40(3) as it applies to the existing facility." 310 Code Mass. Regs. §16.22(2) (emphasis added). A Minor modification of a site assignment includes “(a]ny request to modify a site assignment that is not subject to 310 CMR 16.22(1) or (2), including any request to modify conditions established by the Board of Health in the site assignment, or any request to increase daily or annual tonnage limits, except as specified at 310 CMR 16.22(4) [Reserve Capacity Approvals].” 310 Code Mass. Regs. §16.22(3) (emphasis added). The Department’s modification regulations are ambiguous, because if ah applicant only seeks to increase the “daily or annual tonnage limit” and makes no modifications to the facility, the modification is deemed minor, 310 Code Mass. Regs. §16.22(3); whereas if an applicant seeks to modify the “solid waste facility’s operations causing it to exceed any capacity or total volume limit stated in its current site assignment!,]” the modification is deemed major. 310 Code Mass. Regs. §§16.02, 16.22(2).
Whether a modification is classified as a major or minor modification is significant. A request for a major modification requires that the applicant submit to the board of health a new site assignment application, a site suitability determination report from the Department, and participate in the board of health’s public hearing. 310 Code Mass. Regs. §16.22(2). A request for a minor modification, however, does not require the “filing of a new application by the applicant or site suitability report by the Department, provided the Board of Health provides public notice and holds a public hearing!.]” 310 Code Mass. Regs. §16.22(3).
As the party challenging the Department’s interpretation of its regulations, the plaintiffs carry the “formidable burden” of establishing that the Department’s interpretation was not rational. Northbridge v. Natick, *304 394 Mass. 70, 74 (1985). Courts “ordinarily accord an agency’s interpretation of its own regulation^] considerable deference.” Warcewicz v. Department of Envtl. Prot., 410 Mass. 548, 550 (1991) (alteration in original). The principle of according weight to an agency’s discretion, however, is “one of deference, not abdication, and [courts should] not hesitate to overrule agency interpretations of rules when those interpretations are arbitrary or unreasonable or inconsistent with the plain terms of the rule itself.” Finkelstein v. Board of Registration in Optomerty, 370 Mass. 476, 478 (1976). Although an agency is given the authority to establish rules, once the agency disseminates the rules, the agency “cannot thereafter arbitrarily construe and apply its rules which as promulgated have dimensions and content not subject to infinite manipulation and expansion.” Id.
In support of their contention that the change here constitutes a minor modification, the defendants place great emphasis on an email they received from John Carrigan, of the Department, stating, “as previously discussed the change is a minor modification not a major modification under 310 CMR 16.00.” A.R. Tab 7. In the Court’s view, however, this email is not entitled to any weight. It is unclear what information John Carrigan relied upon in making this determination. Nor is there any evidence showing what information the Department had reviewed when it originally concluded that the Application constituted a minor modification.
An administrative regulation is to be construed in the same manner as a statute. Costa v. Fall River Hous. Auth., 71 Mass.App.Ct. 269, 277 (2008); Tesson v. Commissioner Dep't of Transitional Assistance, 41 Mass.App.Ct. 479, 482 (1996). “[A] basic tenet of statutory construction [is] that a statute must be construed ‘so that effect is given to all its provisions, so that no part will be inoperative or superfluous.’ ” Bankers Life & Cas. Co. v. Commissioner of Ins., 427 Mass. 136, 140 (1998), quoting 2A B. Singer, Sutherland Statutory Construction §46.06 (5th ed. 1992). “Courts will view a regulatory scheme as a whole and whenever possible will interpret overlapping or concurrent treatment of a common subject by multiple provisions harmoniously so as to preserve some useful effect for each one.” Costa, 71 Mass.App.Ct. at 277.
The defendants’ Application sought to increase the transfer station’s solid waste processing capacity from 100 tons per day to an average of 400 tons per day, with a maximum allowance of 500 tons a day. A.R. Tab 11. The Application also proposed demolishing the existing transfer station and building a 4,200 square-foot larger transfer station.[8] Id. In essence, the defendants’ Application seeks to increase the transfer station’s daily tonnage limit and capacity by building a new transfer station capable of processing the increased tonnage.
Here, the proposed demolition of the existing facility and the construction of the new facility is designed precisely to enable the facility to “exceed [the] capacity or total volume limit stated in its current site assignment.” 310 Code Mass. Regs. §16.02. That being so, the Application sought to “Expand a Site” within the meaning of 310 Code Mass. Regs. §16.02, and, thus make a major modification to the site assignment, within the meaning of 310 Code Mass. Regs. § 16.22(2).
To conclude that the defendants’ Application constituted a minor modification would require the conflation of the “increase daily or annual tonnage” limit language of §16.22(3) with the “to modify a solid waste facility’s operations causing it to exceed any capacity or total volume limit” language of §16.02, when it is apparent that the phrases have distinct meanings. If the phrases were interpreted to apply to the same conduct, then the “Expand a Site” language that classifies a project as a major modification would be unnecessary. See Bankers Life & Cas. Co., 427 Mass. at 140 (statute must be construed as to give effect to all its provisions). Based on the veiy language of the regulations, a minor modification occurs when the transfer station does not require any structural changes to handle an increase in the facility’s daily tonnage limit.[9] The “Expand a Site” portion of the major modification regulation, therefore, only applies when the transfer station requires structural modifications to be able to process the increased tonnage limit.[10]
For the reasons just discussed, the Court concludes that the defendants’ Application was improperly classified as an application for a minor modification and considered under the regulations governing minor modifications to a site assignment. The Board’s decision, therefore, must be vacated. However, in the event that a reviewing court may disagree, this Court will address the other issues raised in the plaintiffs’ Motion for Judgment on the Pleadings.
b. Public Hearing
The plaintiffs contend that the Board violated numerous sections of the Public Hearings regulations. See 310 Code Mass. Regs. §16.20. For example, they contend that the Board violated 310 Code Mass. Regs. §16.20(10) (f)(1), which requires that a witness’ testimony be made “under oath or affirmation,” because none of the witnesses was sworn prior to testifying at the public hearing. However, on November 25, 2009, Dirk, Hanscom, Raczynski, and Thomson each submitted a document entitled, “Attestation of Testimony,” in which each man swears that the testimony he gave before and the documents which he filed with the Board were truthful. Memorandum of Intervenor Northside Carting, Inc. In Opposition to Motion for Judgment on the Pleadings, Ex. A.[11] The regulations do not require any particular type of memorialization of the oath or affirmation, and the Court sees no compelling reason to invalidate the witnesses’ testimony because it was sworn to after it was made. See Commonwealth v. Cote, 15 Mass.App.Ct. 229, 237 *305 (1983) (“We can see no compelling reason, however, to invalidate a complaint merely because it issued upon statements which were sworn to subsequent to their making”).
Next, the plaintiffs argue that the hearing officer violated 310 Code Mass. Regs. §16.20(11)(c)(4) and (6) because Northside’s experts were given an unlimited amount of time to testify and present evidence in support of the Application, while the hearing officer limited members of the public making comments during the public comment portion of the second hearing to two minutes or less. The hearing officer’s duties include, “assisting all those giving testimony to make a full and free statement of the facts in order to bring all information necessary to determine whether a site is suitable or not suitable”; and “ensuring that participants have an opportunity to present evidence whether orally or in writing, relevant to the suitability or non-suitability of a site.” 310 Code Mass. Regs. §16.20(11)(c)(4), (6). The regulations provide hearing officers with broad discretion; for example, the hearing officer “shall impose such time restrictions and limitations on oral presentations as he deems appropriate.” 310 Code Mass. Regs. §16.20(11)(d)(3).
At the start of the public comment portion of the second night of the hearing, the hearing officer stated that there were fifteen people waiting to comment and twenty people waiting to ask a question. Because questions required more time than comments, the hearing officer suggested that people limit their comments to two minutes or less so that there would be sufficient time to answer questions. On four occasions, the hearing officer informed individuals making comments that they had exceeded their two-minute time allotment. The hearing officer, however, allowed each individual to conclude his or her comments. The hearing officer had to inform one of the speakers, Paulette Puleo, three times that she had exceeded her two-minute time allotment before she concluded her remarks. Near the end of the public comment portion of the hearing, the hearing officer reminded the audience that the Board would continue to accept written comments after the hearing concluded. In light of the fact that the public was told it could make comments, ask questions, and submit written comments after the hearing, the hearing officer acted appropriately in limiting comments to two minutes or less in an effort to preserve enough time for the question portion of the hearing.
Additionally, the plaintiffs argue that the Board failed to make specific findings of fact in the Conditions of Approval regarding the site suitability criteria listed in 310 Code Mass. Regs. §16.40. General Laws c. 30A, §11(8) requires that every agency decision be “accompanied by a statement of reasons for the decision, including determination of each issue of fact or law necessary to the decision!.]” This requirement exists so that a reviewing court is thoroughly able to review the agency’s decision for error. Nstar Elec. Co. v. Department of Pub. Utils., 462 Mass. 381, 386-87 (2012). An Agency “need not set forth a lengthy statement of factual and legal conclusions as long as its decision contains adequate reasons to allow the court to exercise its function of appellate review.” Maddocks v. Contributory Ret. Appeal Bd., 369 Mass. 488, 497 (1976). The Board’s failure to make explicit findings of fact in the Conditions of Approval is not fatal to its decision. The Board issued its decision after it extensively discussed the defendants’ Application during the two-night public meeting, i.e., the November 10th and 24th public hearings. The Conditions of Approval included forty-three detailed conditions. Based on the Board’s two nights of deliberations, on December 8th and 15th, which were open to the public and were recorded, as well as based on the forty-three conditions included in the Conditions of Approval, an adequate record exists for the court to review the correctness of the Board’s decision. The detail of the discussions and the Conditions of Approval enable the Court to ascertain with confidence the law and facts upon which the decision was based.
. Finally, the plaintiffs allege that the Board failed to publish the notice of its decision within seven days of the decision being issued, in violation of 310 Code Mass. Regs. §16.20(13)(b). This argument merits little consideration. Contrary to the plaintiffs’ contention, the Board did not issue its decision on December 15, 2009. The Board voted on the defendants’ Application at that time and issued its decision on February 11, 2010. The notice of decision was published on February 16, 2010. The Board, therefore, complied with the notice regulation.
c. Health Care Facility
The plaintiffs argue that the Board should have denied the defendants’ Application because a health care facility operates within 500 feet of the transfer station. The defendants argue that the Board was not required to consider the site suitability criteria articulated in 310 Code Mass. Regs. §16.40, because the Application contemplated a minor modification. Because in fact, the Application involved a major modification, the Board was required to consider the site suitability criteria articulated in the regulation. Title 310 Code Mass. Regs. §16.40(3)(d)5.b.ii prohibits placing a transfer station handling solid waste at a site that is within 500 feet of a health care facility. The Court does not resolve this issue, because the Board did not actively consider the location of the health care facilities. However, the Court notes that the property located at 331-333 Highland Avenue is less than 500 feet from the transfer station property and houses multiple health care practices.
d. Standards and Criteria for Siting Facilities
The plaintiffs argue that because Northside’s original Traffic Study was flawed and because the Air Report and Noise Study were based on the flawed *306 Traffic Study, the Board did not properly consider a variety of the standards and criteria for siting facilities as articulated in G.L.c. Ill, §150Al/2. The plaintiffs contend the Board failed properly to consider the following provisions of G.L.c. 150A1/2: (6) the nature and extent of residential areas in proximity to the site; (7) the availability and suitability of access roads to the site; (9) the potential for adverse impact on air quality; (10) the potential for creation of a nuisance from noise, windblown litter, or the proliferation of rodents, flies, or other vermin; (11) the potential for adverse public health and safety impacts; (14) the potential of increased traffic volume on the roads to the site; and (17) the potential adverse impacts on communities within one-half mile of the proposed site including the potential adverse impacts on the considerations stated within this section for which site suitability standards and criteria are established. The defendants contend that the Board properly considered these criteria and that the Board’s decision is supported by substantial evidence. The detail of the Conditions of Approval makes it apparent that the Board did take into account the relevant siting factors which the plaintiffs contends the Board ignored. The plaintiffs’ argument that the Board violated the standards and criteria for siting facilities in G.L.c. Ill, §150Al/2 fails.
As previously noted, the Conditions of Approval specifically incorporate many of the criteria which the studies assumed. For instance, the Conditions of Approval: limit the number of commercial vehicles entering the transfer station to 115 (230 vehicle roundtrips); require that the facility operator conduct routine street sweeping along Swampscott Road from the intersection of Highland Avenue to First Street; require the transfer station to use high-speed transfer doors that are to be closed except when vehicles enter and exit; prohibit vehicles from idling; control traffic to minimize congestion; install after-market emission control kits on facility-owned or operated vehicles; conduct a noise evaluation within 180 days of opening and, if the evaluation indicates that dBA levels exceed a 5 dBA increase, the facility must install noise attenuation features within 330 days of opening; contract with a licensed pest control management firm; install an air system capable of producing negative pressure in the transfer station; install a misting system; and continue to monitor the traffic situation to determine if additional alterations are necessaiy. A.R. Tab 39(3), (7), (11), (14), (16), (17), (23), (25), (26), (28), (37), (38), and (40).
In sum, had the Board’s proceedings been governed by 310 Code Mass. Regs. §16.22(3), the regulation governing minor modifications of a site assignment, its decision would stand. The proceedings, however, were actually governed by the more stringent regulation, 310 Code Mass. Regs. §16.22(2), which outlines the procedures for major modifications of a site assignment. The proceedings were not conducted consistent with those procedures. As a result, the Board’s decision is a nullity.
ORDER
For the reasons stated above, the Plaintiffs’ Motion for Judgment on the Pleadings is ALLOWED, and the Board of Health of the City of Salem’s decision allowing the Application for a Minor Modification to a Site Assignment for the Salem Transfer Station is VACATED.

 For ease of reading, the Court will refer to the November 10, 2009 hearing as Transcript Day 1; the November 24,2009 hearing as Transcript Day 2; the December 8, 2009 deliberative session as Transcript Day 3; and the December 15, 2009 deliberative session as Transcript Day 4.

 Prior to submitting the Application, John Carrigan of the Department emailed Salem’s City Solicitor, Beth Rennard, to inform her that, “(a]s we discussed previously the change is a minor modification not a major modification under 310 CMR 16.00.” A.R. Tab 7.

 In 2007 Northside reported that the transfer station processed approximately 25 tons of waste per day. A.R. Transcript Day 1 at 65:17-66:1. Northside, however, contends, “over the course of a 4-year average, in terms of receipts at the facility based on what was reported to the DEP, the facility receives on average about 43.2 tons per day[.]’’ A.R. Transcript Day 2 at 15:7-11.

 Pure tone is defined as “conditions where one octave band frequency is 3 dB or more greater than an adjacent frequency. An example of a ‘pure tone’ is a fan with a bad bearing that is producing an objectionable squeaking sound.” A.R. Tab 11, Figure 4 at 3-1.

 During the November 10, 2009 public hearing Alan Hanscom of Beta Group, Inc. conceded that the Property is “an existing site assigned site[.]” A.R. Transcript Day 1 at 164:15.

 As previously noted, the existing transfer station comprises 5,500 square feet. The Application seeks to increase the size of the tipping room floor by 2,000 square feet to 7,500 square feet. The Application then seeks to add an additional 2,200 square feet to the transfer station to provide space for processing and loading operations. A.R. Tab 11, Figure l.The new transfer station, therefore, will be approximately 9,700 square feet, or 4,200 square feet larger than the existing transfer station.

 An example of a minor modification is if a facility’s site assignment limits the facility to 100 tons of waste per day, but the facility is physically and structurally capable of processing 400 tons of waste per day and sought a modification allowing it to process 400 tons of waste per day.

 A major modification would consist of a situation where the transfer station would require structural changes or the construction of a new transfer station to process an increase in the facility’s daily tonnage limits.

 There was no objection to the Court’s consideration of these documents in connection with the motion for judgment on the pleadings.