Connon, Richard F., J.
INTRODUCTION
Plaintiff Independence Seaport Museum filed this conversion, fraud, and breach of fiduciary duty action against its former president, John Carter, seeking to recover in excess of $2 million Carter allegedly stole from the museum. This matter is before the court on the plaintiffs motion for summary judgment on Counts I, II, III and IV of the First Amended Complaint pursuant to Mass.R.Civ.P. 56. For the reasons discussed below, the plaintiffs motion is ALLOWED as to liability and ALLOWED in part as to damages.
BACKGROUND
The undisputed facts, and the disputed facts viewed in the light most favorable to the defendants as non-moving parties, as revealed by the summary judgment record are as follows. The Independence Seaport Museum (“ISM”) is a non-profit organization, located in Philadelphia, which was established to preserve the maritime history of the Philadelphia region. ISM is funded through charitable contributions, private donations of money, boats, ships and other assets, and grants from the state of Pennsylvania and the United States government. Defendant John Carter (“Carter”) was the president of ISM from 1990 until June 14, 2006, with responsibilities and duties including raising charitable contributions, managing the museum’s day-to-day operations, and serving as a member of ISM’s governing body, the Board of Port Wardens (“the Board”).
On February 17, 1997, ISM entered into a Supplemental Executive Retirement Program (“SERP”) for Carter’s benefit. ISM obtained a $2 million life insurance policy on Carter’s life with Lincoln National Life Insurance Company (“the Policy”). Pursuant to the SERP, Carter as owner and ISM as assignee-owner entered into a Split Owner/Split Dollar Life Insurance Plan Assignment (“the Assignment”). Under the SERP and the Assignment, ISM paid the Policy’s annual $100,000 premium from December 1996 through December 2005. Under the SERP, Policy, and Assignment, upon Carter’s death or the cancellation of the Policy or the Assignment, ISM is entitled to receive an amount equal to the lesser of the cumulative premium payments or the Policy’s net cash surrender value. Under the SERP, ISM cannot unilaterally terminate or cancel the SERP, the Policy, or the Assignment until Carter reaches age 65.
On June 14, 2006, ISM dismissed Carter from his position as president after conducting an investigation into allegations that he had engaged in financial improprieties with ISM funds. On January 2, 2007, Carter submitted a Release of Assignment form to Lincoln National which purported to contain the signatures of Board members Walter D’Alessio and George Pew. On January 10, Lincoln National sent a Change Confirmation letter to Carter, stating that the company had received and was processing his request to release the split dollar assignment on the Policy. ISM investigated and confirmed that neither D’Alessio nor Pew had signed the release. On January 19, D’Alessio certified in a letter to Lincoln National that his signature on that document was a forgery and that ISM did not intend to release the assignment on the account. The SERP, Policy, and Assignment remain in effect.[2]
On January 22, 2007, ISM commenced this action against Carter by filing a verified complaint for injunc-tive relief and damages. ISM also filed an affidavit by Peter McCausland (“McCausland”), the Chairman of the Board, attached to which is a Proof of Loss Affidavit executed by ISM’s Acting President, Karen Cronin. The Proof of Loss Affidavit, which ISM submitted to its insurer, St. Paul Travelers, contains business records and affidavits detailing ISM’s loss caused by Carter, in the total amount of $2,392,942.70. Based upon the Proof of Loss Affidavit, ISM’s verified complaint alleged that Carter stole approximately $2,400,000 from ISM, including $1,765,087.90 of museum funds used to purchase and maintain boats for Carter’s personal use and enjoyment; improper use of ISM credit cards to pay for $250,000 of personal expenses; $200,000 in fraudulent reimbursements for expenditures which were fictitious or non-museum related; and $177,854.67 in acquisitions that are either unaccounted for or were for Carter’s personal use.
ISM’s verified complaint sought pre-judgment relief in the form of trustee process attachments, a real estate attachment, injunctive relief, and the appointment of a receiver. This Court allowed a $2.4 million real estate attachment and trustee process attachments in the amount of $2.4 million on January 22, 2007 and issued a temporary restraining order against Carter prohibiting him from transferring, concealing, or encumbering property worth more than $100. In addition, this Court appointed a receiver on February 27, 2007. Carter did not oppose any of this relief.
On March 9, 2007, Carter filed his amended answer, admitting that on March 28, 2006, ISM’s Executive Committee placed him on a paid leave of absence and hired the law firm of Saul Ewing, LLP to investigate allegations against him. Carter further admitted that he was under investigation by the FBI and the United States Attorney’s Office in Philadelphia, and that ISM had retained the accounting firm Nihill & Riedley to analyze the museum’s financial records. With respect to virtually all of the factual allegations describing fraud, conversion, and breach of fiduciary duly, Carter invoked his Fifth Amendment privilege rather than admitting or denying the allegations.
*593 On May 21, 2007, the United States Attorney for the Eastern District of Pennsylvania filed an Information charging Carter with two counts of mail fraud in violation of 18 U.S.C. §1341 and one count of tax evasion in violation of 26 U.S.C. §7201 stemming from his scheme to defraud ISM of more than $1,500,000 from 1997 to April of 2006. Count I of the Information, which alleged mail fraud, summarized Carter’s scheme to defraud as follows:
The object of this scheme to defraud was for defendant JOHN S. CARTER to obtain unauthorized personal financial benefits by misusing his authority as president and chief executive officer of ISM in the following ways, among others: (a) creating and submitting fraudulent invoices for cash reimbursements to defendant CARTER for work that was never performed and for work performed at defendant CARTER’S personal residence in Osterville, Massachusetts and which was made to appear as if performed at the ISM-owned Spruce Street property in Philadelphia; (b) purchasing and charging to ISM a wide variety of merchandise and other personal items that were intended for defendant CARTER rather than ISM and which defendant CARTER falsely claimed were legitimate ISM business expenditures; (c) purchasing and charging to ISM services and other items that were delivered and installed at defendant CARTER’S Osterville address and which defendant CARTER fraudulently stated were charges associated with the ISM-owned Spruce Street property in Philadelphia; (d) purchasing and charging ISM for the construction of a wooden sailboat for defendant CARTER personally at a repair facility that was repairing other ISM vessels; (e) obtaining title to a one-of-a-kind vessel which had been donated to the ISM, arranging for the ISM to pay for the vessel’s refurbishment, and then selling the vessel and retaining all of the proceeds for the defendant CARTER; and (f) purchasing with ISM funds a modern luxury power boat which defendant CARTER used for his own personal pleasure, all without the knowledge or approval of ISM’s board of directors.
Paragraph 10 of Count I of the Information further described Carter’s scheme to defraud as follows:
Between approximately 2001 and 2006, defendant JOHN S. CARTER used for his own personal benefit several different credit cards issued to ISM including, among others, a corporate American Express card, a corporate Mellon Bank business Mastercard, an MBNA Platinum Plus for Business card, and a Citibank business Mastercard. Using these credit cards, defendant CARTER made numerous purchases of services and merchandise for his own personal benefit. In order to avoid paying for the purchases out of his own pocket, defendant CARTER routinely submitted the credit card statements to ISM’s accounting department for payment and fraudulently misrepresented the nature and the purpose of the transactions.
Finally, Paragraph 11 of Count I of the Information stated:
Between approximately 1997 and 2006, defendant JOHN S. CARTER routinely fabricated reimbursement requests by creating fictional invoices and by making photocopies of the front side of personal checks he submitted for reimbursement but which were never actually negotiated in order to further the illusion that he had incurred out-of-pocket expenses for the benefit of ISM. Based on his fraudulent misrepresentations, ISM paid the reimbursement requests.
Count II of the Information, which also alleged mail fraud, stated:
The object of this scheme to defraud was for defendant JOHN S. CARTER to obtain control of a split dollar life insurance policy in which [ISM] had a substantial ownership interest, and which had a cash surrender value in excess of $1 million and a death benefit of $2 million.
Paragraphs 11 and 12 of Count II of the Information described that scheme as follows:
On or about December 21, 2006, more than one month after the FBI and IRS executed a search and seizure warrant at his resident in Osterville, Massachusetts, defendant JOHN S. CARTER telephoned Lincoln National Life Insurance Co. requesting information about obtaining a loan on the policy. Defendant CARTER was advised during the conversation that he had a split dollar assignment on the policy. Defendant CARTER requested that a release of assignment form be sent to him. Lincoln National Insurance Co. complied with this request and faxed the release of assignment form to defendant CARTER.
On or about January 2, 2007, defendant JOHN S. CARTER forged the signatures of two members of the board of directors of ISM onto the release of assignment form, and transmitted the form to Lincoln National Insurance Co. by U.S. mail. Specifically, defendant CARTER forged the signatures of ISM’s board chairman and board vice chairman onto the form.
Finally, paragraph 14 of Count II stated:
On or about January 10, 2007, in reliance on the fraudulent release of assignment that defendant JOHN S. CARTER had submitted, Lincoln National Life Insurance Co. processed the request and released the assignment, thereby divesting ISM of any further interest in the policy.
Count III of the Information, which alleged income tax evasion, alleged that Carter failed to report on his tax returns more than $ 1.5 million in proceeds he received as result of his fraudulent schemes. On May 21, 2007, *594 the U.S. Attorney issued a press release regarding the Information which stated in relevant part:
As the information alleges, the defendant used the Museum’s funds as his personal piggy bank. He spent with reckless abandon, went to extraordinary lengths to conceal his fraudulent activities, and abused the trust placed in him by the museum.
On June 4, 2007, Carter pleaded guilly to two counts of mail fraud and one count of tax evasion as set forth in the Information. The Guilty Plea Agreement executed by Carter states that he agreed to plead guilty to “two counts of mail fraud, in violation of 18 U.S.C. §1341, and one count of income tax evasion, in violation of 26 U.S.C. §7201.” The Guilly Plea Agreement also states, “the defendant is agreeing to plead guilty because the defendant admits that he is guilty.” In the Guilly Plea Agreement, Carter agreed not to contest the forfeiture under 18 U.S.C. §982(a)(4) of proceeds from his fraud totaling $1,560,156.
On October 12, 2007, the United States Attorney filed the government’s sentencing memorandum, which stated that during the plea colloquy, Carter admitted to engaging in the fraud schemes and tax offenses alleged in the information. The government summarized Carter’s wrongdoing as follows:
Defendant John Carter, the once respected president and chief executive officer of [ISM], abused his position and the trust accorded to him, by single handedly engaging in an enduring criminal enterprise that resulted in fraud losses of more than $1.5 million from ISM. Through an elaborate pattern of deception and greed that continued even after he was finally exposed as a thief and removed from his position, Carter imposed upon ISM a heavy and enduring financial hardship. Less than two months after his home was raided by federal agents who filled a moving truck with items he fraudulently obtained, defendant Carter committed a new fraud and attempted to steal an additional $ 1 million in museum property in the form of a split dollar life insurance policy by forging the signatures of ISM board members onto a legal document.
On November 2, 2007, based upon Carter’s guilly plea to all charges, the U.S. District Court entered a Judgment and Preliminary Order of Forfeiture (“Judgment”) against Carter in the criminal case. The Judgment states that $1,560,156 is subject to forfeiture as proceeds derived from or traceable to his mail fraud offenses. Carter was sentenced to 190 months in prison and ordered to pay a $30,000 fine as well as make restitution of $1,330,011.13. He has yet to make any restitution to ISM.
On February 1, 2008, this Court allowed ISM to amend its complaint in this action to allege that ISM’s losses due to Carter’s actions are now estimated at $2,864,050, based on a continuing investigation. Count I of the First Amended Complaint alleges conversion of $2.86 million of ISM’s money and assets. Count II alleges fraud and Count III alleges breach of fiduciary duty. Count IV seeks an equitable injunction and declaratory relief that ISM is entitled to cancel or terminate the Policy and to recover the cumulative premium payments, cash surrender value, or death benefits thereunder. Count V alleges unjust enrichment against Carter’s wife, Karin Carter; Count VI alleges that she committed a civil conspiracy; and Count VII seeks the imposition of a constructive trust against her.
McCausland has filed an affidavit in support of ISM’s motion for summary judgment. As Chairman of the Board, McCausland’s duties have included monitoring, directing, and receiving reports on ISM’s investigation of Carter’s misconduct. In addition, McCausland closely followed the federal criminal proceedings against Carter. McCausland avers that based on ISM’s investigation to date, its reasonable, good faith estimate of its damages is $2,843,730, comprised of $1,189,637 in losses related to SADIE,[3] RUWEIDA,[4] SEQUESTER,[5] CYRENE,[6] ENTICER[7] and missing collectibles; $1,249,835 in improper credit card expenditures; and $404,258 in improper reimbursements. According to McCausland, this total does not include ISM’s attorneys fees, accounting fees, or other expenses related to investigating and dealing with Carter’s wrongdoing.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
ISM moves for partial summary judgment on Counts I, II, and III of the First Amended Complaint on the ground that Carter’s guilty plea in federal court to mail fraud establishes his civil liability for conversion, fraud, and breach of fiduciary duty as a matter of law. ISM seeks entry of judgment in its favor in the amount of $2,843,730 or, in the alternative, in an amount of at least $1,560,156. ISM further moves for summary judgment on Count IV of the First Amended Complaint, requesting a declaration that ISM is the owner of the Policy, has the unilateral right to cancel *595 or terminate the Policy, and is entitled to receive its cumulative premium payments or the net cash surrender value of the Policy. Carter opposes summary judgment on the ground that his guilty plea in federal court is not conclusive to establish his liability in this civil action, particularly because the crimes of mail fraud and income tax evasion have different elements than the tort claims now asserted by ISM. Carter has not filed any affidavits or other admissible summary judgment materials under Mass.R.Civ.P. 56(c) to contradict the factual record submitted by ISM.
I. PRECLUSIVE EFFECT OF GUILTY PLEA
The general rule in Massachusetts is that a parly to a civil action against a former criminal defendant may invoke the doctrine of collateral estoppel to preclude the criminal defendant from re-litigating an issue decided in the criminal prosecution. Aetna Cas. & Sur. Co. v. Niziolek, 395 Mass. 737, 742 (1985). A jury’s verdict of guilt in a criminal case conclusively establishes the elements of the crime charged and the same factual issues may not be re-litigated in a later civil case. Id. at 747 (insured’s conviction of burning insured property conclusively established that he caused his house to be burned with fraudulent intent for purposes of insurer’s civil action to recover loss paid to insured). See also Costa v. Fall River Hous. Auth., 71 Mass.App.Ct. 269, 283, rev. granted, 451 Mass. 1103 (2008).
In contrast, although a guilty plea is an admission of the material facts alleged in the indictment which is admissible in evidence against that person in subsequent civil litigation, a guilty plea is not conclusive as to the facts admitted. Aetna Cas. & Sur. Co. v. Niziolek, 395 Mass. at 747; Morrissey v. Powell 304 Mass. 268, 269 (1939). This is so because collateral estoppel can be used only to prevent re-litigation of issues actually decided in a prior lawsuit, and the taking of a guilty plea is not the same as an adjudication on the merits after a full trial. Aetna Cas. & Sur. Co. v. Niziolek, 395 Mass. at 748-49. Although the judge taking a plea must satisfy himself that there is a factual basis for a charge, he need not find that the defendant actually committed the crime to which he is pleading guilty. Id. at 749. Moreover, a defendant may plead guilty because of extrinsic considerations such as reduced expenses and elimination of the risk of a more serious conviction and punishment. Costa v. Fall River Hous. Auth., 71 Mass.App.Ct. at 283. These factors justify treating a conviction after a guilty plea differently from a conviction after trial for purposes of collateral estoppel. Aetna Cas. & Sur. Co. v. Niziolek, 395 Mass. at 750. Thus, the defendant’s guilty plea and any other admissions made during the plea-taking colloquy have no preclusive effect in subsequent civil litigation but have an evidentiary effect as admissions of a party-opponent. Peabody Prop., Inc. v. Sherman, 418 Mass. 603, 607 (1994); Aetna Cas. & Sur. Co. v. Niziolek, 395 Mass. at 750; Costa v. Fall River Hous. Auth., 71 Mass.App.Ct. at 283.
II. ISM’s TORT CLAIMS AGAINST CARTER
A. LIABILITY
1. Conversion
Count I of the First Amended Complaint alleges that Carter converted approximately $2.86 million of ISM’s money and assets for his personal use. Conversion is the wrongful exercise of acts of ownership, control, or dominion over the personal property of another. Third Nat’l Bank of Hampden County v. Continental Ins. Co., 388 Mass. 240, 244 (1983); Cahaly v. Benistar Prop. Exchange Trust Co., Inc., 68 Mass.App.Ct. 668, 679 (2007), affd, 451 Mass. 343 (2008); Abington Nat’l Bank v. Ashwood Homes, Inc., 19 Mass.App.Ct. 503, 507 (1985). Accord Francis J. Bernhardt III, P.C. v. Needleman, 705 A.2d 875, 878 (Pa.Super. 1991). Money is personal property which may be converted. Morrin v. Manning, 205 Mass. 205, 211 (1910). By pleading guilty in the federal case, Carter has admitted to the material facts alleged in the Information. Aetna Cas. & Sur. Co. v. Niziolek, 395 Mass. at 747; Morrissey v. Powell, 304 Mass. at 269. The Information includes extensive and detailed factual allegations that Carter used fraudulent invoices to obtain reimbursement from ISM for work performed on his Osterville home, including construction of a carriage house, purchase of a wood shed, landscaping, installation of a sprinkler system, and roof replacement. See ¶¶ 13-33 of Count I of the Information. The Information also contains extensive and detailed factual allegations that Carter caused ISM to pay for personal expenditures, including jeweliy, electronic equipment, home and garden supplies, gourmet food, kitchen equipment, clothing, home furnishings, tools, books, artwork, antiques, and personal vacations, by falsely describing credit card purchases for these items as museum-related purchases. See ¶¶34-113 of Count I of the Information. Finally, the Information contains extensive and detailed factual allegations that Carter caused ISM to incur construction, purchase, maintenance, and storage expenses for boats that he personally owned or museum-owned boats which he used for his personal pleasure. Seeffl 14-140 of Count 1 ofthe Information. Following Carter’s guilty plea, all of these material factual allegations have evidentiary weight in this summaiy judgment motion as admissions by Carter. Peabody Prop., Inc. v. Sherman, 418 Mass. at 607; Aetna Cas. & Sur. Co. v. Niziolek, 395 Mass. at 750; Costa v. Fall River Hous. Auth., 71 Mass.App.Ct. at 283.
Carter argues in his brief that “(mjaterial facts are in dispute as to whether Mr. Carter intentionally and wrongfully exercised acts of ownership, control and dominion over personal property of the Museum to which he had no right of possession at the time. Prior guilty pleas do not establish intent.” Nonetheless, Carter has failed to offer any admissible evidence, by *596 affidavit or otherwise, to contradict the admissions described above. Accordingly, the summary judgment record presents no genuine issue of material fact with respect to the underlying conduct giving rise to ISM’s conversion claim. One who is lawfully in possession of personal property may commit conversion when he uses that property in a manner that exceeds his authority and thereby seriously violates the right of another to control the use of that property. See Cahaly v. Benistar Prop. Exchange Trust Co., Inc., 68 Mass.App.Ct. at 679 (investment company converted investors’ funds by violating restrictions on use of funds); Restatement (Second) Torts §228 (1965) (conversion by exceeding authorized use). The undisputed evidence that Carter, who was authorized to expend museum funds as president of ISM, spent those funds for his personal benefit establishes his liability for conversion.
2. Fraud
Count II of the First Amended Complaint alleges that Carter defrauded ISM of approximately $2.86 million. To prove fraud, the plaintiff must show that the defendant made a false representation of a material fact, with knowledge of its falsity, for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied on the representation as true to its detriment. Danca v. Taunton Savings Bank, 385 Mass. 1, 8 (1982); Chan v. Chen, 70 Mass.App.Ct. 79, 82 (2007); Ravosa v. Zais, 40 Mass.App.Ct. 47, 52, rev. den., 422 Mass. 1108 (1996). Accord Glover v. Severino, 946 A.2d 710, 713 (Pa.Super. 2008). The Information contains extensive and detailed factual allegations that Carter falsely represented to ISM, through phony invoices, correspondence and other documents, that funds he was spending were for museum-related purchases and services when in fact, he expended the funds for his personal benefit. See 818114-113 of Count I of the Information. The Information further alleges that ISM paid invoices and credit card bills and reimbursed Carter for claimed expenditures in reliance on his false statements that the goods and services at issue were legitimate museum-related expenses. See ¶¶20, 23, 27, 30, 38, 40, 43, 46, 48, 50, 52, 54, 56, 58, 60, 62, 64, 67, 70, 72, 73, 76, 78, 80, 82, 83, 85, 87, 88, 91, 93, 94, 96, 98, 100, 103, 104, 106, 108, 111, 113 of Count I of the Information. In addition, the Information alleges that Carter falsely represented to ISM, through phony invoices, correspondence and other documents, that funds he was spending were related to museum-owned boats when in fact, he expended the funds for his personal benefit. See Ml 15-140 of Count I of the Information. The Information alleges that ISM paid invoices and credit card charges for these claimed expenditures in reliance on Carter’s false statements that the services at issue were legitimate museum-related expenses. See Ml 18, 125, 135 of Count 1 of the Information. Following Carter’s guilty plea, all of these material factual allegations have evidentiaiy weight in this summary judgment motion as admissions by Carter. Peabody Prop., Inc. v. Sherman, 418 Mass. at 607; Aetna Cas. & Sur. Co. v. Niziolek, 395 Mass. at 750; Costa v. Fall River Hous. Auth., 71 Mass.App.Ct. at 283.
Carter argues in his brief that “[m]aterial facts are in dispute as to whether Mr. Carter made false representations of material fact with knowledge of its falsity for the purpose of inducing the Plaintiff to act thereon, and whether the museum relied upon the misrepresentation as true and acted upon it to its damage.” Again, however, Carter has failed to offer any admissible evidence, by affidavit or otherwise, to contradict the admissions described above. Accordingly, the summary judgment record presents no genuine issue of material fact with respect to the underlying conduct giving rise to ISM’s fraud claim. The undisputed evidence that Carter falsely represented to ISM, through phony invoices, correspondence and other documents, that funds he spent were for museum-related purchases and that ISM paid these expenses in reliance on said false representations establishes his liability for fraud as a matter of law. Cf. In re Friedman, 200 B.R. 1, 5 (D.Mass. 1996) (summary judgment in bankruptcy discharge proceeding precluded where although debtor pleaded guilty to willful failure to file income tax return, he submitted affidavit stating that he never intended to evade taxes, creating material factual issue concerning intent and wilfulness).
3. Breach of Fiduciary Duly
Count III of the First Amended Complaint alleges that Carter’s conduct breached his fiduciary duty to ISM as president and board member. A director of a non-profit organization stands in a fiduciary relationship to the organization. 15 Pa. Cons. Stat. Ann. §5712. A fiduciary owes a duty of undivided loyally and utmost good faith, and must not use his position to obtain a personal benefit or advantage at the expense of the organization. See Wisniski v. Brown & Brown Ins. Co. of PA, 906 A.2d 571, 577 (Pa.Super. 2006), rev. den., 920 A.2d 834 (Pa. 2007); InfoSAGE, Inc. v. Mellon Ventures, L.P., 896 A.2d 616, 637 (Pa.Super. 2006). The Information alleges that as a director of ISM, Carter owed a fiduciary duty to the museum and was required to adhere to a 1996 Code of Ethics that ISM directors must not attempt to derive any personal material advantage from their position and must use museum property only for official purposes. See ¶3 of the Information. Moreover, in his Amended Answer to this lawsuit, Carter admitted “that he owed the Museum a fiduciary duty to act in its best interests.” The Information contains extensive and detailed factual allegations that Carter falsely represented to ISM, through phony invoices, correspondence and other documents, that funds he was spending were for museum-related purchases and services when in fact, he expended the funds for his personal benefit. See Ml4-113 of Count I of the Information. Following Carter’s guilty plea, these ma *597 terial factual allegations have evidentiary weight in this summary judgment motion as admissions by Carter. Peabody Prop., Inc. v. Sherman, 418 Mass. at 607; Aetna Cas. & Sur. Co. v. Niziolek, 395 Mass. at 750; Costa v. Fall River Hous. Auth., 71 Mass.App.Ct. at 283.
As noted above, Carter argues in his brief that “(m)aterial facts are in dispute as to whether Mr. Carter made false representations of material fact with knowledge of its falsity for the purpose of inducing the Plaintiff to act thereon, and whether the museum relied upon the misrepresentation as true and acted upon it to its damage.” However, Carter’s failure to offer any admissible evidence, by affidavit or otherwise, to contradict the admissions described above makes those facts undisputed. Carter’s conduct in using museum funds for his personal benefit and engaging in fraud in order to do so breached his fiduciary duty to ISM as a matter of law. See Lutherland, Inc. v. Dahlen, 53 A.2d 143, 147 (Pa. 1947) (breach of fiduciary duty for officer/director to use position to obtain personal profit at expense of corporation); In re Paxson Trust I, 893 A.2d 99, 121 (Pa.Super.), rev. den., 903 A.2d 538 (Pa. 2006) (breach of fiduciary duty for trustee to reap personal benefit from unauthorized use of trust property). Accord Geller v. AUied-Lyons PC, 42 Mass.App.Ct. 120, 122 (1997) (breach of fiduciary duty for directors/officers to promote their own interests in manner injurious to corporation); Horwitz v. Horwitz, 3 Mass.App.Ct. 753, 754 (1975) (breach of fiduciary duty to dispose of trust property for personal gain).
Thus, ISM is entitled to judgment as a matter of law with respect to Carter’s liability for conversion, fraud, and breach of fiduciary duty as alleged in Counts I, II and III of the First Amended Complaint.

B. DAMAGES

There remains the question of whether ISM is entitled to summary judgment on the issue of the damages caused by Carter’s tortious conduct. The U.S. District Court entered a judgment that the loss from Carter’s mail fraud offense in Count I of the Information totaled $1,560,156. ISM has submitted the affidavit of McC-ausland, attached to which is the Proof of Loss which ISM submitted to its insurer. The Proof of Loss includes ISM business records, analysis of these records, and affidavits obtained in the course of ISM’s investigation of Carter’s wrongdoing. The Proof of Loss details losses totaling $2,392,949.70 comprised of $490,000 relating to ALBACORE, $268,370.41 relating to NELLIE, $71,092.80 relating to SADIE, $276,096.54 relating to RUWIEDA, $477,483.48 relating to SEQUESTER, $445,864.29 relating to CYRENE, $136,180.60 relating to ENTICER, $250,000 in credit card expenditures, $200,000 in reimbursements, and $177,854.67 in missing collectibles. In a later affidavit, McCausland avers that based on its continuing investigation, as of March 20, 2008, ISM’s reasonable, good faith estimate of its damages is $2,843,730, comprised of $1,189,637 relating to SADIE, RUWEIDA, SEQUESTER, CYRENE, ENTICER and missing collectibles; $1,249,835 in credit card expenditures, and $404,258 in reimbursements. The most significant difference between the Proof of Loss and the updated McCausland affidavit is an increase from $250,000 to $1,249,835 in the credit card expenditures deemed to be fraudulent and an increase from $200,000 to $404,258 in the reimbursements deemed to be fraudulent. These increases, however, are not accompanied by the type of supporting documentation provided in the Proof of Loss.
Carter asserts in his brief that there are material facts in dispute relative to ISM’s alleged damages, particularly with respect to the difference between the $1.5 million in losses alleged by the federal government in the criminal prosecution and the $2.86 million alleged by ISM in its First Amended Complaint. This mere assertion is not sufficient to create a genuine dispute of material fact for purposes of Rule 56. See Wiedmann v. Bradford Group, Inc., 444 Mass. 698, 708 (2005) (party opposing summary judgment cannot rest on mere assertion of disputed facts); Hanover Ins. Co. v. Leeds, 42 Mass.App.Ct. 54, 59 n.6 (1997) (unsubstantiated assertion in party’s opposition brief insufficient to avoid summary judgment). Carter has failed to offer any admissible evidence by affidavit or otherwise, to contradict the numbers placed into evidence by McCausland’s affidavits and the Proof of Loss. Accordingly, ISM’s damages are undisputed in the amount of $2,392,942.70, as detailed in the Proof of Loss and accompanying documentation. To the extent that ISM seeks to recover additional losses in its First Amended Complaint, such losses are subject to proof in a future assessment of damages hearing.
III. EQUITABLE RELIEF WITH RESPECT TO INSURANCE POLICY
Finally, ISM moves for summary judgment on Count IV of the First Amended Complaint, which “demands that the Court decree that the Museum is the owner of the Policy, and that it is authorized as Owner and as As-signee-Owner to cancel or terminate the Policy, or to take any such other action that it deems appropriate to recover the cumulative premium payments, the cash surrender value, or the death benefits under the Policy without any obligation to consider or respect Carter’s wishes regarding the Policy.” The asserted basis for this equitable relief is Carter’s breach of fiduciary duly, particularly as applied to the Policy.
Carter claims in his brief that there are “several material facts as it relates to the SERP: 1) whether Mr. Carter allegedly forged the names of [the] board members; 2) whether the museum should be adjudicated the owner of the SERP; 3) whether the museum has the legal right to cancel the SERP.” Count II of the Information alleged that:
On or about January 2, 2007, defendant JOHN S. CARTER forged the signatures of two members of *598 the board of directors of ISM onto the release of assignment form, and transmitted the form to Lincoln National Insurance Co. by U.S. mail.
See ¶12 of Count II. Following Carter’s guilty plea, this material factual allegation has evidentiaiy weight in this summary judgment motion as an admission by Carter. Peabody Prop., Inc. v. Sherman, 418 Mass. at 607; Aetna Cas. & Sur. Co. v. Niziolek, 395 Mass. at 750; Costa v. Fall River Hous. Auth., 71 Mass.App.Ct. at 283. Carter has failed to offer any admissible evidence, by affidavit or otherwise, to contradict this admission. Accordingly, the summary judgment record presents no genuine issue of material fact with respect to the underlying conduct giving rise to ISM’s claim for equitable relief with respect to the Policy.
The only question is what equitable relief, if any, this Court may appropriately grant ISM to remedy Carter’s egregious breach of fiduciary duty and in particular, his fraudulent attempt to divest ISM of its interest in the Policy. Carter’s attempt to defraud ISM of its rights under the SERP and Assignment constitutes a breach of fiduciary duty. See Lutherland, Inc. v. Dahlen, 53 A.2d at 147; In re Paxson Trust I, 893 A.2d at 121. In addition, Carter’s conduct constitutes a breach of the covenant of good faith and fair dealing implied in every contract that neither party will do anything to injure the other’s right to receive the benefit of their agreement. See Toy v. Metropolitan Life Ins. Co., 928 A.2d 186, 197 (Pa. 2007). However, ISM has no legal remedy for the contractual breach insofar as the terms of the relevant documents do not permit ISM to unilaterally terminate or cancel the SERP, the Policy, or the Assignment until Carter reaches age 65.
The Superior Court has broad equitable power to fashion a remedy for a breach of fiduciary duty and fraud. Brodie v. Jordan, 447 Mass. 866, 871 (2006); Demoulas v. Demoulas, 428 Mass. 555, 580 (1998). Accord Nebesho v. Brown, 846 A. 2d 721, 726 (Pa.Super. 2004). Where the breach involves the denial of a party’s reasonable expectation of benefit, the remedy should, to the extent possible, restore the benefit reasonably expected but not received because of the fiduciary breach. Brodie v. Jordan, 447 Mass. at 870-71. In addition, rescission of an agreement or transaction may be ordered to avoid unjust enrichment of the fiduciary at the expense of a beneficiary. Demoulas v. Demoulas, 428 Mass. at 580-81. Cf. Gaw v. Sappett, 62 Mass.App.Ct. 405, 413 (2004) (where fiduciary has engaged in inequitable conduct which evades the spirit of a contractual bargain or destroys other party’s right to receive fruits of agreement, court has equity jurisdiction to deny fiduciary relief under that agreement). See also Lee v. Dahlin, 159 A.2d 679, 681 (Pa. 1960) (one who breaches fiduciary duty with resulting loss to other party forfeits his right to compensation).
Here, equity demands that ISM be relieved of the burden of its obligations to Carter under the Policy, SERP, and Assignment, that Carter not be permitted to receive any continued benefit from the arrangement, and that ISM’s interest under the Policy be restored. Section IIB of the Assignment states that in the event that ISM and Carter agree to cancel or terminate the Policy or Assignment, ISM’s policy interest “shall be equal to the lesser of the amount of cumulative premiums paid by [ISM] to the Insurer, less any amounts already received by [ISM] via policy loans or withdrawals, or the policy’s net cash surrender value.” The undisputed evidence in the summary judgment record is that ISM’s cumulative premium payments total $1,000,000 and the net cash surrender value of the Policy is $1,119,543. Given the absence of any material factual dispute relating to Count IV of the First Amended Complaint, it is appropriate for this Court, in its discretion, to impose the equitable remedy of permitting ISM to unilaterally terminate the Policy, SERP and Assignment and seek recovery of its cumulative premium payments in accordance with the terms of those documents.
ORDER
For the foregoing reasons, it is hereby ORDERED that the plaintiffs motion for summary judgment on Counts I, II and III of the First Amended Complaint be ALLOWED as to the issue of liability. Plaintiffs motion for summary judgment on Counts I, II and III of the First Amended Complaint is further ALLOWED as to damages in the amount of $2,392,942.70. Any and all amounts claimed by the Plaintiff not a part of the damages as contained herein will be subject to a separate hearing to be scheduled within sixty days. It is further ORDERED that plaintiffs motion for summary judgment on Count IV of the First Amended Complaint be ALLOWED. It is hereby ORDERED and DECLARED that ISM is entitled to unilaterally terminate and/or cancel the Policy, SERP, and Assignment and seek recovery of the cumulative premium payments.

As of August 21, 2007, ISM’s cumulative premium payments total $1 million and the net cash surrender value of the Policy is $1,119,543.

SADIE is a 38-foot sailboat. In 2005, Carter used ISM funds to construct SADIE for his personal ownership and use.

RUWIEDA is an R-class sloop that was donated to the museum in 1993. After spending ISM funds to restore this sloop, Carter donated it to the International Yacht Restoration School in Newport, Rhode Island. The donation served his personal interests, not those of ISM.

SEQUESTER is a sport fishing boat which Carter acquired with ISM funds in 1997 and then proceeded to operate for his personal use.

CYRENE is a 1999 power boat which Carter acquired with ISM funds and then operated for his personal use.

ENTICER is a luxury yacht donated to the museum in 1995. Carter authorized an extensive refurbishment project for ENTICER which occurred between October of 2000 and July 2002. During this period, he made numerous purchases for his personal benefit and listed them as ENTICER expenses.